104 F.3d 1407
 323 U.S.App.D.C. 59
 NOTICE: D.C. Circuit Local Rule 11(c) states that unpublished orders, judgments, and explanatory memoranda may not be cited as precedents, but counsel may refer to unpublished dispositions when the binding or preclusive effect of the disposition, rather than its quality as precedent, is relevant.
UNITED STATES of America, Appellee,
v.
Albert J. SAMS, Appellant.
 No. 95-3152, 95-3179.
 United States Court of Appeals, District of Columbia Circuit.
 Dec. 9, 1996.
 
 Before: WALD, GINSBURG and TATEL, Circuit Judges.
 
 JUDGMENT
 
 1
 This appeal was considered on the record from the United States District Court for the District of Columbia, the briefs filed by the parties, and oral argument held on November 8, 1996. The Court has determined that the issues presented occasion no need for a published opinion. See D.C.Cir. Rule 36(b). For the reasons stated in accompanying Memorandum, it is
 
 
 2
 ORDERED AND ADJUDGED by the Court that the order of the District Court is affirmed.
 
 
 3
 The Clerk is directed to withhold issuance of the mandate herein until seven days after disposition of any timely-filed petition for rehearing. See D.C.Cir.Rule 41(a).
 
 ATTACHMENT
 MEMORANDUM
 
 4
 In August of 1994, the United States Park Police began an undercover investigation into the sale of "Bum Rush," a form of heroin, near the intersection of 50th Street and Burroughs Avenue, N.E. Undercover officers made 66 purchases of "Bum Rush" from 15 different street-level dealers, or "runners," and followed the runners in an effort to find their suppliers. Police arrested Bruce Douglas, the "owner" and central participant in the conspiracy to distribute "Bum Rush" in that area, and Douglas testified for the government at the trials of other participants.
 
 
 5
 One of Douglas' "Bum Rush" runners was Albert Sams, a heroin addict and brother-in-law of one of the "lieutenants" in Douglas' "Bum Rush" operation. Sams regularly received "Bum Rush" from two of Douglas' lieutenants and sold it on the street, keeping some for his own use as payment and returning the money from the sales to the lieutenants.
 
 
 6
 Douglas first obtained his supply of heroin from a Nigerian man named Francis. After Francis left the country Douglas began dealing with Francis' wife Innie, who would receive the drugs from Raheem Dawodu and then turn them over to Douglas. Dawodu was a friend of Francis' who grew up with Francis in Nigeria. After Innie too left the country, Francis' cousin Tony replaced Innie as a go-between for Dawodu. After police arrested him, Douglas identified Dawodu, Tony, and Innie as his suppliers, and assisted the government in arresting Dawodu in the act of completing a drug transaction. Police arrested Sams after he sold "Bum Rush" on the street to an undercover agent eight times.
 
 
 7
 The government indicted Sams for conspiracy to distribute and to possess with intent to distribute one kilogram or more of heroin in violation of 21 U.S.C. § 846, and eight counts of unlawful distribution of heroin within 1,000 feet of a school in violation of 21 U.S.C. § 860(a). The government indicted Dawodu for conspiracy to distribute and to possess with intent to distribute one kilogram or more of heroin in violation of § 846, and a forfeiture count. The trial of Sams and Dawodu began on June 5, 1995. On June 16, 1995, the jury found Sams and Dawodu guilty on the conspiracy charge, and found Sams guilty of the eight lesser-included offenses of distribution of a controlled substance (to which Sams had offered no defense). The appeals of Sams and Dawodu were consolidated in the current action. Pursuant to our careful review of the record and arguments presented on appeal, we affirm the appellants' convictions and sentencing.
 
 A. Sams--Ineffective Assistance of Counsel
 
 8
 Sams claims that he was denied the counsel guaranteed by the Sixth Amendment because his trial counsel presented, as his sole defense to the conspiracy count, a theory with no basis in the law or in any good faith argument for extension of the law. The record provides some support for the claim that the performance of Sams' counsel fell below the standard of competence required under Strickland v. Washington, 466 U.S. 668 (1984), but we cannot conclude that Strickland's "prejudice" requirement is also satisfied. Because the issues surrounding the "prejudice" component of the Strickland test are conclusively settled by the trial record alone, we need not remand this claim for an evidentiary hearing. See United States v. Fennell, 53 F.3d 1296, 1303-04 (D.C.Cir.1995).
 
 
 9
 Sams' trial counsel clearly presented an invalid coercion-by-intoxication defense to the jury as Sams' principal, if not solitary, defense to the conspiracy charge.[1] His counsel began his opening argument by telling the jury that "the defense of Mr. Sams is one of coercion, is one of physiological and psychological coercion based on his addiction to heroin. He had no choice." Transcript ("Tr.") 126. He finished his closing argument by reiterating "the defense": "we believe that after you hear all the evidence that you will find that he was coerced by his addiction to participate as a means of obtaining narcotics for his own use...." Tr. 129. The record indicates that by the end of the trial the government and the judge had both developed a clear understanding of the proper structure of Sams' intoxication defense, and yet Sams' counsel still failed to abandon the invalid coercion theory, and his closing argument included the following language: "[w]e have been arguing to you that he lacked the specific intent, specifically the willfulness aspect of it, because of heroin intoxication" (Tr. 1035); "[T]hat was his sole motivation, just to have the heroin" (Tr. 1037); "Does that sound like a person who is not intoxicated to heroin? Not so under its influence that it controls and dictates his conduct?" Tr. 1038.
 
 
 10
 It may be possible for a defense lawyer to satisfy the Strickland standard while using a defense with little or no basis in the law if this constitutes a reasonable strategy of seeking jury nullification when no valid or practicable defense exists, but such was not the case in regard to Sams' conspiracy charge. Sams was in a position to show the jury that he was addicted to heroin during the time he was charged with participating in the conspiracy, and thus he could have relied upon the valid defense of lack of "specific intent." And even if reliance upon the coercion-by-intoxication defense had been a reasonable strategy at the outset of the trial, it is much more doubtful that to continue phrasing Sams' defense in this fashion after the judge had invalidated this defense and explained the "specific intent" defense also was reasonable. Thus, there is some support for the assertion that Sams' lawyer's performance fell below "an objective standard of reasonableness." Strickland, 466 U.S. at 687.
 
 
 11
 Although Sams' counsel may have failed to satisfy the Strickland standard in choosing and presenting Sams' conspiracy defense, we cannot conclude that this substandard performance prejudiced Sams' trial because the judge clearly instructed the jury not to find Sams guilty of conspiracy unless they found that Sams had the "specific intent" required as an element of the conspiracy charge, and the judge explained that the jury could consider the evidence of Sams' drug addiction in relation to this element of the crime. Specifically, the judge's instructions included the following language:
 
 
 12
 [L]adies and gentlemen, you heard me say at an earlier time that drug addiction was not a defense in this case, and that is correct. Drug addiction is not a defense in this case; nor is drug addiction a crime, nor is use of narcotics by itself a crime. Possession is; use of narcotics and drug addiction are not. However, part of the theory of Mr. Sams' case is that he was intoxicated during times relevant to the conspiracy in this case to the extent that since the conspiracy requires proof of specific intent to commit the conspiracy that he was so intoxicated that he could not form the specific intent to commit that offense.
 
 
 13
 Now, Mr. Rudasill will state it to you much more eloquently than I have, but that is the essence of one of the defenses that will be asserted on behalf of Mr. Sams, and that is that he could not form the specific intent, that conspiracy is a crime of specific intent, and that at times relevant to your decision-making with respect to the conspiracy count, Count One, that he did not form the specific intent. The government has not proved that he had the specific intent and, therefore, that you must acquit Mr. Sams on that count. He will tell you more about that when it is his turn to speak, but let me say that you have heard evidence suggesting that Mr. Sams was under the influence of drugs at the time of the charged offense, the conspiracy we're speaking about. Intoxication, by itself, does not relieve a person of responsibility for his acts. However, a person may be so under the influence of drugs that he cannot form the specific intent to participate in a conspiracy which is a necessary part of the conspiracy to distribute and possess with intent to distribute a kilogram or more of heroin. If evidence of intoxication gives you a reasonable doubt about whether the defendant, Mr. Sams, could or did form the specific intent to participate in the conspiracy, then you must find him not guilty, because a necessary element is missing.
 
 
 14
 Tr. 995-96. Because the jury was thus clearly directed by the court to consider Sams' strongest defense, and because the jury heard Sams' own testimony describing the extent and severity of his addiction, we cannot conclude that Sams' counsel's statements tending to obfuscate this defense were sufficiently prejudicial that there is a reasonable probability that the outcome would have been different had his performance been adequate. See Strickland, 466 U.S. at 694, and thus we find that Strickland's "prejudice" component was not satisfied.[2]
 
 
 15
 B. Sams--Failure to Instruct the Jury on Possible Multiple Conspiracies
 
 
 16
 Sams asserts that the evidence introduced at trial could reasonably have been thought to support the factual conclusion that Sams was involved, at most, in a separate, smaller conspiracy than the one comprised of Dawodu, Douglas, and numerous other suppliers and lieutenants arrested in the "Bum Rush" sting; on this ground, Sams asserts that it was error for the judge to refuse a request to submit this factual issue to the jury in an instruction. Specifically, Sams asserts that the evidence supported the conclusion that there was one conspiracy involving Douglas and his lieutenants, which pursued the distribution of heroin in the area of Burroughs Avenue and 50th Street, and another conspiracy involving Douglas, Dawodu, and others, which pursued the importation, sale, and purchase of large quantities of heroin. The government counters that all of the evidence pointed to a "classic 'chain conspiracy,' " wherein each "link" shares a common goal, and each is aware of its dependence upon the "links" higher up and lower down. If Sams' dual-conspiracy theory was supported by the evidence in his trial, it would have been error for the judge to refuse his proffered instruction. See United States v. Graham, 83 F.3d 1466, 1472 (D.C.Cir.1996) (citing United States v. Tarantino, 846 F.2d 1384, 1400 (D.C.Cir.1988)).
 
 
 17
 The judge did not err in refusing this instruction because there is no basis in the record for Sams' assertion that this criminal combination could be viewed as two separate conspiracies, rather than as a single "chain" conspiracy. Sams' argument is premised on an attempt to sever in two the "chain" conspiracy which Douglas organized, and in which Douglas' lieutenants and runners participated, but there was no evidence that tended to suggest that either of the allegedly independent portions of this conspiracy could have survived without the other. Douglas did not have alternative distribution mechanisms to get his "Bum Rush" to the street, nor did Sams and the other runners have alternative sources to meet their customers' demand for this unique and popular "brand" of heroin. In fact, although in making this argument Sams asserts that "[t]here was no evidence that any of the persons with whom Sams dealt (Best or Nichols) had anything to do with Francis, Innie, [Tony] Kuke, Dawodu, or Gimo," Sams Brief at 33, another portion of the same brief acknowledges the unitary nature of the classic "chain" conspiracy illustated by the evidence at trial: "Dawodu and Kuke received large quantities of [heroin] and sold it to Douglas.... Ware, Best, and Nichols all acted ... as lieutenants in Douglas' organization: they would receive 25 to 30 ten-packs of heroin from Douglas per day, distribute the ten-packs to runners, collect money from the runners, and return the money to Douglas.... Sams ... sold the drugs he received from the lieutenants...." Sams Brief at 44. Because the multiple-conspiracy theory had no support in the evidence presented at trial, the judge did not err in denying Sams' request for an instruction on this theory.
 
 C. Sams--Base Offense Level at Sentencing
 1. The Amount of Heroin Attributed to Sams
 
 18
 At sentencing, the court set Sams' base offense level by attributing to him all of the heroin that Douglas' "Bum Rush" operation distributed during the time that Sams was a member of the "Bum Rush" conspiracy. Sams argues that the sentencing court erred by failing to meet the requirement, described in United States v. Saro, 24 F.3d 283 (D.C.Cir.1994), and elaborated in United States v. Anderson, 39 F.3d 331 (D.C.Cir1994) and United States v. Graham, 83 F.3d 1466 (D.C.Cir.1996),[3] that a court sentencing a defendant convicted on a drug-conspiracy charge must base the sentencing on individualized findings regarding the quantity of drugs that were within the scope of the particular defendant's agreement in joining the conspiracy. We review the factual findings of a sentencing court for "clear error," United States v. Foster, 19 F.3d 1452, 1455 (D.C.Cir.1994), and we give "due deference" to the sentencing court's application of the sentencing guidelines to the facts. United States v. Kim, 23 F.3d 513, 517 (D.C.Cir.1994) (quoting 18 U.S.C. § 3742(e)(4) (1988)).
 
 
 19
 The record of the sentencing demonstrates that the judge explained his attribution to Sams of a much larger quantity of drugs than Sams distributed personally by recounting facts about the unique character of Sams' involvement in the conspiracy, and thus the judge satisfied the Saro requirement of individualized findings. The judge did not simply describe the amount of drugs involved in the entire conspiracy, note that Sams was part of the conspiracy, and then attribute the entire quantity to Sams. Rather, the judge expressly found that Sams had not engaged in "side deals" [Tr. 9/14/16], that he worked within sight of several other sellers whom he knew to be selling the same drugs obtained from the same source [Id. at 17], that he "was aware of the identities and roles of most if not all of the members of the organization" [Id. at 20], that his brother-in-law, a lieutenant in the organization, had recruited him to become a seller [Id. at 21], and that with this extensive knowledge of the size and scope of the organization, Sams "agreed to sell as much of the Bum Rush heroin as he was supplied for as long as possible," a period which turned out to be about two and a half months. [Id. at 19] The judge's findings regarding Sams' participation in the conspiracy certainly could not be thought to apply automatically to any other "runner"; these findings dealt with Sams' particular knowledge of the scope of the operation and his "enthusiastic" [Id. at 18] commitment to participate in the conspiracy as extensively as he could. By making these individualized findings the judge satisfied the obligation articulated in Saro.[4]
 
 
 20
 Sams argues, in the alternative, that the judge's particularized findings regarding the extent of his participation in the conspiracy were clearly erroneous, but the judge's findings are supported by the evidence in the record. This evidence included a videotape showing Sams interacting with several other members of the conspiracy [Tr. 318], the testimony of a law enforcement officer who had purchased heroin from Sams eight times [Tr. 310-35], had observed Sams selling heroin in close proximity to other sellers [Id.], and had seen Sams meeting with Douglas [Tr. 358], the testimony of another street-level seller who said that Sams gave him rides to the place where they both sold heroin [Tr. 282], and Sams' own testimony that his brother-in-law, a lieutenant in the organization, had caused him to become involved in the conspiracy [Tr. 862, 64-65]. Therefore, we find that the sentencing court properly applied the relevant guideline to Sams' conspiracy conviction, based on factual findings regarding Sams' involvement in the conspiracy that were not clearly erroneous.
 
 
 21
 2. The Judge's Refusal to Grant Sams a "Minor Participant" Reduction
 
 
 22
 The Sentencing Guidelines provide that a sentencing court should grant a defendant a two-level reduction in his sentence if the defendant was a "minor participant" in the offense. U.S.S.G. § 3B1.2(b) (1995). Sams argues that the judge clearly erred in refusing him a "minor participant" adjustment in light of the fact that his role as a "runner," or a street-level seller, was the least responsible position in the conspiracy. Sams argues on appeal that the judge's error in failing to grant him this downward adjustment is particularly acute in light of the fact that the judge had treated Sams, in determining the amount of drugs to be attributed to him, as part of very far-ranging conspiracy including much larger quantities of drugs than Sams ever dealt with personally.
 
 
 23
 The judge's failure to grant a "minor participant" adjustment was not clear error and merits the deference of this court, because the fact that Sams occupied a low position on the totem pole of the conspiracy does not automatically require that he be considered "less culpable than most other participants." U.S.S.G. § 3B1.2 appl. note 3 (1995); United States v. Caballero, 936 F.2d 1292, 1299 (D.C.Cir.1991) ("a courier can play as active and culpable a part in a drug offense as another participant, whether or not that participant is another courier"). Nor does the simple comparison of Sams' role with the roles played by several more highly-placed conspirators demonstrate any clear error in the failure to grant the reduction; this was a very large conspiracy, and the presence of several more-culpable participants in no way proves that "most" participants were more culpable than Sams. Furthermore, the judge cited evidence that affirmatively supported his conclusion that Sams was more than a minor participant, including Sams' "enthusiastic" participation, his knowledge of the scope of the conspiracy in which he was involved, and his willingness to distribute as much of the "Bum Rush" as he was given to sell.
 
 
 24
 3. The Judge's Refusal to Grant Sams an "Acceptance of Responsibility" Reduction
 
 
 25
 Sams also made an unsuccessful request for a sentence reduction under U.S.S.G. § 3E1.1(a), which provides for a two-level reduction for a defendant who "clearly demonstrates acceptance of responsibility for his offense." U.S.S.G. § 3E1.1(a) (1995).
 
 
 26
 Sams acknowledges that such reductions are not generally available to defendants who put the government to its burden of proof at trial, but he argues that his is nevertheless an appropriate case for such a reduction because "he accepted responsibility for his conduct; he challenged only the legal ramifications of that conduct." Sams Brief at 46. This is a very strained reading of the guideline, however, because despite his concessions regarding his "conduct" (which he hardly could have denied, since a videotape of him engaging in the conduct was shown at his trial), Sams had claimed that his state of mind while engaging in that conduct was such that he should not be held "responsible." Thus, he did not "accept" criminal "responsibility" for his offenses. The Application Notes to this guideline recommend that the "rare" situations in which defendants who "deny[ ] the essential factual elements of guilt" will nevertheless be entitled to this adjustment should include, for example, cases in which a defendant resists punishment on some ground unrelated to the issue of guilt--such as the unconstitutionality of the charging statute. U.S.S.G. § 3E1.1 appl. note 2 (1995). This is not such a situation, nor is it even remotely analogous to such situations, and therefore this "rare" exception should not here be invoked. Thus the sentencing court did not commit clear error in finding that Sams had not accepted responsibility for his crime, and the judge's refusal to grant a downward departure on this ground was proper.
 
 
 27
 D. Dawodu--Denial of Proffer of Character Testimony
 
 
 28
 Before putting on his defense, appellant Dawodu proffered witnesses who would have testified regarding his character for truthfulness, and the judge acted in accordance with Federal Rule of Evidence 608(a) in refusing to permit Dawodu to introduce these witnesses at trial. See FED.R.EVID. 608(a) ("evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise").[5]
 
 
 29
 Dawodu claims that the prosecution's cross-examination of him in effect attacked his "truthful character," and thus that the judge erred in continuing to bar him from introducing his proffered character witnesses after the cross-examination. The government's cross-examination was very effective in demonstrating that Dawodu's story didn't scan, but it didn't tend to impress upon the jury the notion that Dawodu had a character for untruthfulness; rather, it simply showed that Dawodu's version of events was unreliable because it was filled with odd behaviors and puzzling coincidences. Thus the judge's continued refusal to permit the character evidence was entirely proper under Rule 608(a).
 
 
 30
 E. Dawodu--The Quantity of Drugs Attributed to Dawodu at Sentencing
 
 
 31
 Dawodu asserts that the judge made inadvertent mistakes, apparently caused by the confusing nature of the evidence, in adding up the total quantity of drugs to be attributed to him at his sentencing. This process required the judge to add up the drugs involved in several different transactions, in regard to which different sets of inferences served to link Dawodu to individual quantities of drugs. We have carefully scrutinized the relevant testimony regarding each transaction underlying the judge's calculation, and we conclude that there was sufficient evidence in the record to support holding Dawodu responsible for at least 1,050 grams of heroin from ten separate transactions, excluding possibly-overlapping testimony and transactions in which Dawodu's involvement is unclear. Thus the judge did not clearly err in finding that Dawodu was involved in the distribution of over one kilogram of heroin.
 
 
 32
 For the foregoing reasons, we affirm the convictions and sentencing of the appellants.
 
 
 
 [1]
 It is well established that coercion due to intoxication is not a defense to a criminal charge. See, e.g., WAYNE R. LAFAVE & AUSTIN W. SCOTT, JR., SUBSTANTIVE CRIMINAL LAW § 4.10 (1986) ("With crimes of which intoxication is not an element, the defendant's defense may be: I committed, while intoxicated, an act that I would not have committed when sober, so that my conduct was the result of my intoxication. His claim that he would not have committed a crime had he been sober is no defense, however, any more than one's claim that he would not have committed a crime of violence had he been a less excitable or pugnacious person, or a crime of theft had he been of a less acquisitive nature" (citations omitted)); see also United States v. Moore, 486 F.2d 1139 (D.C.Cir.1973)
 It is also well established that intoxication is at least a plausible defense to "specific intent" crimes, which according to this circuit's law, see United States v. Childress, 58 F.3d 693, 706-09 (D.C.Cir.1995), would include conspiracy to distribute illegal drugs in violation of § 846. See, e.g., LAFAVE & SCOTT, supra § 4.10 ("Intoxication is a defense to crime if it negatives a required element of the crime; and this is so whether the intoxication is voluntary or involuntary.... [G]enerally intoxication, when it negatives an element of the crime, does so by negativing some mental element (intent or knowledge) which the crime requires.... It is sometimes stated that intoxication can negative a "specific intent" which the crime in question may require...." (citing United States v. Scott, 529 F.2d 338 (D.C.Cir.1975)).
 
 
 [2]
 Contrary to Sams' assertion, we do not find the judge's instruction on the "specific intent" defense to be inconsistent with the judge's earlier remarks to the jury that "[i]f there would have been a defense at all on the crime of specific intent, it might have been to the fact that he was a drug addict, according to Mr. Rudasill's opening statement." Tr. 853; Brief of Appellant Albert J. Sams ("Sams Brief") at 29, Reply Brief of Appellant Albert J. Sams ("Sams Reply Brief") at 8-10. In this earlier statement, the judge certainly did not tell the jury that no such defense existed; to the contrary, he seems to have been trying to explain that Sams' lawyer could properly have articulated such a defense. The judge later reinforced the idea that this defense must be considered by the jury in its deliberations, by means of his instruction on the "specific intent" defense. Therefore we cannot agree with Sams' assertion that the judge's earlier comment constituted reversible error
 
 
 [3]
 At oral argument, Sams' counsel suggested that the judge erred by applying the standard for attribution of drugs described in United States v. Childress, 58 F.3d 693 (D.C.Cir.1995), because in Childress this court applied a version of the "Relevant Conduct" sentencing guideline which has since been overhauled by a 1992 amendment. But the language from Childress that the judge cited and applied is entirely in keeping with the Saro standard that Sams argues should have been applied to his sentencing. The commentary following the 1992 amendment describes it as "clarif[ying]" and "more fully illustrat[ing]" the operation of this guideline, rather than significantly altering its scope. U.S.S.G. app. C at 322 (1995). The Saro court agreed with this characterization, noting that its approach to the sentencing of conspirators would be required even under the pre-amendment version of the guidelines, which the court described as merely making certain prerequisites to conspirator liability "more explicit." Saro, 24 F.3d at 288. Moreover, Childress itself cites Saro regarding the need for individualized findings on the scope of a defendant's conspiratorial agreement, see Childress, 58 F.3d at 723, and Sams' brief cites Childress four times in support of his argument that the judge was required to make such individualized findings at his sentencing. See Sams Brief at 38-42. In his reply brief Sams does not cite Childress on this issue, but continues to cite the very portions of Saro that Childress cited and applied. Compare Sams Reply Brief at 15 ("Sams contends that ... the trial court failed to make the necessary particularized findings regarding 'the scope of the conspiratorial agreement [Sams] joined' " (quoting Saro, 24 F.3d at 288) with Childress, 58 F.3d at 723 ("conspirators [may be held] responsible for conduct that is 'reasonably foreseeable' and 'in furtherance of their joint undertaking,' i.e., within the scope of the defendant's conspiratorial agreement" (citing Saro, 24 F.3d at 288))
 
 
 [4]
 We followed Sams' counsel's recommendation at oral argument that we consider the appropriateness of Sams' sentence in light of application note (c)(6) following Section 1B1.3 of the Sentencing Guidelines, U.S.S.G. § 1B1.3 appl. note (c)(6) (1995), and we do not agree that this note mandates a contrary result. Note (c)(6) describes two end points on the spectrum of active participation in a broader drug-selling conspiracy, and Sams falls somewhere in the middle. The note does not indicate that "Defendant P" has any knowledge of the size and scope of the drug-selling conspiracy in which he is involved, and stresses that "Defendant P" operates independently of the other dealers. Moreover, Sams bears at least some affirmative resemblance to "Defendant Q" because Sams drove a lieutenant in the conspiracy to the locations at which the "Bum Rush" was sold
 
 
 [5]
 We have found no case in which this court has expressly set forth the standard of review applicable to a judge's following Rule 608(a) by excluding evidence of a witness' character for truthfulness. However, because we find that the judge's action fell squarely within that rule and must be affirmed even under de novo review, we need not reach that issue today