*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 18-CO-1174

LEON TRUESDALE, JR., APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2010-CF1-011562)

(Hon. William M. Jackson, Trial Judge)

(Argued September 28, 2022                    Decided March 5, 2026)

*Gregory G. Marshall*, with whom *Anna M. Lashley* was on the brief, for appellant.

*David P. Saybolt*, Assistant United States Attorney, with whom *Matthew M. Graves*, United States Attorney at the time of argument, and *Chrisellen R. Kolb*, *Nicholas P. Coleman*, *Pamela S. Satterfield*, and *Jocelyn Ballantine*, Assistant United States Attorneys, were on the brief, for appellee.

Before BLACKBURNE-RIGSBY, *Chief Judge*, and BECKWITH and HOWARD, *Associate Judges*.

Opinion for the court by *Associate Judge* BECKWITH.

Dissenting Opinion by *Chief Judge* BLACKBURNE-RIGSBY at page 39.

BECKWITH, *Associate Judge*: Calvin "Mike" Godsey, a marijuana dealer, was fatally shot in the stairwell of his apartment building while making a sale. The government's theory was that although the appellant, Leon Truesdale, did not fire the shots that killed Godsey, Truesdale was guilty of felony murder because Godsey was killed during a robbery that Truesdale planned with his friend Corey Hilton, the admitted shooter of the fatal shots. Though no physical evidence placed Truesdale at the site of the shooting and a disinterested government witness testified that Truesdale was *not* among the assailants he saw running from the scene, Hilton testified pursuant to a plea deal that Truesdale was present, armed, and part of the plot to rob Godsey. Another witness, Aaron Cook—a mutual friend of Hilton and Godsey who had arranged the sale—likewise implicated Truesdale after the government gave Cook immunity.

Truesdale's defense theory was that he was nearby, but not present, when the shooting occurred and that although he planned to buy marijuana, he was unaware of and played no role in the robbery that led to Godsey's death. While Hilton went with Cook (the go-between) to Godsey's building to buy the drugs, Truesdale remained in a minivan down the street and was surprised when Hilton and Cook came hurrying back—Hilton carrying a gun and limping—before they all made their escape in the van. The testimony of Hilton and Cook that was at odds with this

account was, Truesdale contended, severely undercut by their stark bias and by the fact that they gave conflicting descriptions of Truesdale's purported actions in the stairwell.  A jury rejected this theory and convicted Truesdale of first-degree felony murder while armed, armed robbery, and a number of related offenses.

At issue in this appeal is Truesdale's assertion—first presented in a motion he filed in Superior Court under D.C. Code § 23-110—that his otherwise viable innocent-presence defense was doomed by the deficient performance of his trial lawyer, who did not file a single pretrial motion, did no legal research for the case, appeared to misunderstand the proof required to convict Truesdale of felony murder, failed to adequately prepare Truesdale to testify, and himself did not prepare for— and therefore often bungled—various legal and evidentiary disputes that arose at trial.  Perhaps most detrimentally, Truesdale contends, counsel put Truesdale on the stand and elicited testimony from him that he was a big-league drug dealer who had no need to rob anyone, opening the door to additional damning (and otherwise inadmissible) information about Truesdale's many prior arrests—including a pending case—yet failing to take basic steps to mitigate the damage of the poorly executed direct examination.

In a fallible government case that by and large came down to whether the jury believed two markedly biased government witnesses over Truesdale, we conclude

that defense counsel's lapses fell below the standard of reasonableness guaranteed by the Sixth Amendment and that there is a reasonable probability that in the absence of counsel's deficient performance Truesdale would have avoided conviction. We therefore reverse the trial court's denial of Truesdale's § 23-110 motion.

## I. The Trial

Leon Truesdale and Corey Hilton were indicted on charges of felony murder, armed robbery, and various other offenses related to the shooting in which Mike Godsey was killed. Rather than risk a trial, Hilton—the man who had fired the bullets that were recovered from Godsey's body—accepted the government's offer to plead guilty to second-degree murder while armed and testify against Truesdale in exchange for a sentence between ten and twenty years in prison.[1]

Hilton's testimony formed a central part of the government's evidence at Truesdale's trial. Hilton testified that on the morning of the shooting, he, Truesdale, and a third unidentified man—the driver—set out in a Chrysler Pacifica minivan to commit a robbery in Baltimore. Truesdale was carrying his .380 semiautomatic handgun. After the robbery plan fell through, the group decided to look for another

---

[1] Hilton was ultimately sentenced to twenty years in prison. Truesdale received a ninety-four-year sentence.

mark.  Hilton reached out to his friend, Aaron Cook, and asked if he knew anyone who could sell him marijuana.  Cook said that he did, so the group picked him up and went to the D.C. home of Godsey, who was Cook's dealer.

Hilton testified that he and Cook met with Godsey in the stairwell of Godsey's apartment building, and Godsey gave Cook a handful of the marijuana to take to Truesdale, who had remained in the minivan with the driver.  According to Hilton, Truesdale liked the sample, and he indicated to Hilton out of Cook's earshot that he would go back to Godsey's building with Hilton and Cook and signal the start of the robbery by asking Hilton for the money.  Hilton said Truesdale was the first to enter the building, where Godsey was waiting in the stairwell.  After Godsey weighed the marijuana, Truesdale asked Hilton for the money and said "you know what time it is" just before Hilton heard several shots fired.  Surprised by what was happening, Hilton reached for his own gun, accidentally shot himself, and then fired nine shots in Godsey's direction.  Hilton and Truesdale fled.

The following day, police arrested Hilton.  Hilton testified that he waived his rights and—initially trying "to make it seem like [he] was the victim"—said that he had been robbed and that Godsey had shot him.  But after the officers told him that people he "thought were loyal to" him had talked, Hilton abandoned his story.  On the stand, he said that he had lied at first because he did not want to admit what he

had done and he wanted to "find a way to get out of it."

Aaron Cook also testified for the government, in some respects corroborating Hilton's account while differing pointedly on certain details. Specifically, Cook told the jury that on the second trip into Godsey's building, when the men were returning to finalize the drug deal, Truesdale followed Hilton and Cook inside. At that point, Hilton started "digging in his pockets and then he said to [Truesdale] . . . 'Give me the rest of the money so we can go ahead and get this done with.'" Truesdale turned his back to the group, dug around in his pockets, turned back around with a gun in his hand and told Godsey, "You know what this is, give it up." Meanwhile, Hilton and Godsey began "to tussl[e] over the marijuana and as they started tussling," Truesdale "shot two or three times." According to Cook, Truesdale then fired at him, grazing his right arm, while Hilton shot at Godsey. Cook dropped to the ground and Hilton and Truesdale took the marijuana and fled. The next day, when police brought Cook into the station to be interviewed, Cook at first lied to the police because he was worried about "the way it looked"—as if he were "the one that did that to" Godsey. He ultimately changed his story and received immunity in exchange for testifying against Truesdale.

Two other civilian witnesses testified to events in the immediate wake of the shooting. Kenneth Colbert testified that on the day of the incident, he was working

on his car out on the street near Godsey's apartment building. Shortly after hearing something that sounded like firecrackers, Colbert observed two men running from the direction of Godsey's building carrying "a pound of weed and a handgun." He testified that he did not recognize either of the two men running back to the car and stated that Truesdale was *not* one of the two men he saw.[2] And Steven Dantignac, a friend of Cook, testified that Cook ran up to his house on the day of the shooting, told Dantignac "[t]hem n****s tried to kill me," and showed him the place on his arm where "he got grazed." The prosecutor asked Dantignac whether Cook told him "how many people had shot him" and Dantignac said, "I believe it was two." According to Dantignac, Cook did not say who was with him when this happened, only that he thought Godsey was dead.

The government's remaining evidence included a cell phone, subsequently connected to Truesdale, that detectives found in a tree box not far from Godsey's apartment in the general direction of where the minivan was parked. The

---

[2] When defense counsel was cross-examining Colbert, he directed Truesdale to stand up and then asked Colbert whether he saw "this individual right here" on that day. The dissent's assertion that Colbert was merely unable to identify Truesdale as one of the two men he saw running from the scene skates around the categorical nature of Colbert's response: He said "no," which meant that *he did not see* Truesdale that day. The government recalled Colbert in its rebuttal case to say that he recognized Cook from the neighborhood and that Cook likewise was not one of the people he saw running back to the car.

government also introduced text messages between Godsey and Cook arranging the marijuana sale and photos and testimony about Godsey's injuries and cause of death, the five 9mm bullets recovered at Godsey's autopsy, the location of the bullet casings found at the scene, and the number and type of guns (a .380-caliber and a 9mm handgun) that likely expelled those casings. The parties stipulated that DNA testing showed that a drop of blood outside the apartment building "matched the DNA profile of the decedent, Calvin Godsey." The government did not introduce any DNA, fingerprints, weapons, ammunition, or stolen property linking Truesdale to Godsey's murder.

Truesdale was the only witness to testify for the defense. Truesdale's attorney, James Rudasill, began his direct examination by asking Truesdale in a nonleading question whether he had previously been convicted of a felony offense. Truesdale responded that he had been convicted of possession with intent to distribute cocaine while armed and attempted possession of cocaine. Rudasill asked "[w]hat year was the possession with intent to distribute while armed conviction?"— it was 1994—and whether Truesdale had "serve[d] any time in jail for that"—he had. Rudasill asked the same about the other felony—"[d]id you serve any time in jail for that?"—at which point the court sustained the prosecutor's relevance objection. On Rudasill's prompting, Truesdale also testified that at the time of the

shooting, he was making roughly $20,000 to $30,000 a week selling PCP and heroin.

Consistent with Hilton's testimony, Truesdale testified that on the day of the shooting, the two men and a driver went to Baltimore. But according to Truesdale, the purpose of the trip was to buy heroin, not to rob anyone. Because the heroin did not meet his standards, he did not make the purchase, and the men returned to D.C., stopping at a Gucci store en route. Although Truesdale—like Hilton and Cook—testified that the group picked up Cook and went to Godsey's home, the intention, according to Truesdale, was simply to purchase marijuana. When they arrived, Cook told the men to wait in the van, walked alone down the street to Godsey's building, and returned shortly after with a sample of marijuana for the men to inspect. Satisfied with the quality of the marijuana, Truesdale gave Hilton $1,250, and Hilton then joined Cook in heading back down the street to the seller's location. The two returned in a hurry three or four minutes later with a bag of weed and a gun. Observing that Hilton was "hobbling down the sidewalk," Truesdale got out of the car and asked what was going on. Hilton said "just get me to the car" and once inside, directed the driver to pull off.

On cross-examination, the prosecutor established that the convictions Truesdale acknowledged on direct were not his only convictions—he had failed to mention convictions of five other offenses: possession of a firearm during a crime

of violence or dangerous offense, carrying a pistol without a license, possession of an unregistered firearm, possession of unregistered ammunition, and possession with intent to distribute marijuana. After persuading the trial judge that Truesdale's testimony on direct that he was a major heroin dealer had opened the door to questions about Truesdale's arrests as well as his convictions—including his arrest in a case that was pending at the time of trial—the prosecutor elicited Truesdale's agreement that "of the times [he had] been arrested, [he had] never been arrested for possession of heroin" or "possession of any quantity of any drug that would yield [him] 20 to 30,000 dollars a week in profit." Likewise, Truesdale agreed that despite being a large-scale drug dealer "who shops at Louis Vuitton and Gucci all around the United States," his cell phone bill was past due, his "official address" was his mother's house, and he didn't own a car but had someone drive him around in a "regular vehicle"—"not like a BMW or Mercedez Benz."

On redirect, Rudasill asked a series of questions about Truesdale's heroin-selling practices, and Truesdale testified that he never personally sold heroin from the street corner—instead, he sold large quantities to the street dealers. Rudasill also mentioned one of Truesdale's pending cases, and when asked about it at a bench conference, acknowledged that it "slipped out of [his] mouth." With the court's permission to conduct a "very limited recross," the prosecutor asked Truesdale

whether the case was still pending, and Truesdale testified that it was.

The jury found Truesdale guilty on all counts. Truesdale appealed, and this court affirmed the convictions.

## II. The § 23-110 Hearing

The present dispute stems from Truesdale's claim in his § 23-110 motion that his trial lawyer was constitutionally ineffective. At the hearing on that motion, Truesdale testified that he initially did not want to take the stand in his murder trial, but the night before the defense was set to present its case (if any), Rudasill visited him at the jail and asked him what he would say if he were to testify. According to Truesdale's testimony at the hearing, he told Rudasill that he would say that at the time of the murder he did not have a reason to participate in a robbery—he "was making between 20 and $30,000 a week" and had shopped at a Gucci store just prior to the offense. He would tell the jury that on the day of the incident, he was in the car with Cook, Hilton, and the driver; the group went to Godsey's house to buy marijuana; but because Cook said "the guy didn't know me," Truesdale never went inside the building.

Rudasill then advised Truesdale to testify. According to Truesdale, Rudasill never did any practice runs with him, never gave him any feedback about his

testimony, never reviewed his prior convictions with him or explained how those convictions would be used at trial if he testified, never practiced cross-examination with him, and never discussed how he should behave while testifying. Truesdale nonetheless took the stand the next morning, giving an account that was "essentially the same thing" he told Rudasill he would say.

For his part, Rudasill testified at the § 23-110 hearing that he sustained a brain injury after Truesdale's trial that affected his short-term memory for "a time." And though he said his "long-term memory was largely intact," at times throughout his testimony he had trouble remembering the details of Truesdale's case six years earlier—in part, he said, because he had three recently pending ineffective-assistance-of-counsel claims that likewise involved his own conduct, and he had "spoke[n] to at least seven different attorneys about the various 23-110s that were active."[3] He testified that at the time of Truesdale's trial, he was suffering from "cumulative stress disorder," seemingly caused by having tried "trials back to back"

---

[3] *See United States v. Winstead*, 890 F.3d 1082, 1087-92 (D.C. Cir. 2018) (determining that Rudasill was constitutionally ineffective in his representation of Winstead); *United States v. Sams*, 104 F.3d 1407, 1996 WL 739013, at *2-3 (D.C. Cir. 1996) (concluding that Rudasill "clearly presented an invalid" defense on behalf of his client and "may have failed to satisfy the *Strickland* standard"); *United States v. Bruce*, 89 F.3d 886, 893-95 (D.C. Cir. 1996) (describing Rudasill's conduct in court as "highly problematic").

for at least a decade preceding his representation of Truesdale. Rudasill was so busy, in fact, that he told Truesdale that because he was stuck in jail "24/7" and had "more time to spend on [his] case" than Rudasill did, he should share with Rudasill any helpful case law he turned up.[4]

With respect to the most serious charge against his client, Rudasill testified that he told Truesdale "that he faced liability, potentially, for felony murder" because the conduct he admitted to (namely, engaging in a large marijuana transaction) "constituted a felony purchase of narcotics"—a perplexing statement given that the felony underlying Truesdale's felony murder charge was armed robbery, not a drug offense. Rudasill testified that Truesdale did not seem to understand what he was telling him and remained "adamant that he did not shoot and kill the man." When asked whether he conducted any legal research for Truesdale's case, Rudasill identified none, and instead returned to his concern about Truesdale's purchase of marijuana constituting the felony in felony murder: He testified that he "saw a narrow window of opportunity to argue that even though [Truesdale] was legally culpable as a co-conspirator in a felony narcotics purchase, that a jury would not hold him responsible if it was demonstrated that he was not an actual shooter."

---

[4] Truesdale testified that he dropped out of high school in the ninth grade but had since received his GED while incarcerated.

When Truesdale's post-conviction attorney asked, "To be clear, he wasn't charged, the predicate offense for felony murder in this case wasn't a narcotics—a controlled substances crime[], correct? It was robbery, right?" Rudasill said "yes" without elaborating. Rudasill testified that he "kept telling" Truesdale that "this was felony murder"—"death committed during the course of felony narcotics transaction, which made it felony murder"—but they could still take a "jury nullification" approach and hope that "the jury finds there's a party more culpable than [Truesdale] and therefore, they won't convict [him] because there's inherent unfairness in the government prosecutorial discretion."

On the subject of how he prepared his client to take the stand, Rudasill corroborated Truesdale's testimony that Rudasill visited him the night before he testified and asked him what he would say on the witness stand if he were to testify. Rudasill said he talked to Truesdale about "his version of the facts" and about "the types of questions" he would be asked if he testified, but he did not "go through with him each individual question that [he] thought the prosecutor would ask." Rudasill was "trying to get to the essence" of "what case [Truesdale] wanted to present to the jury." According to Rudasill, Truesdale "wanted the jury to understand" that it was "the government's cooperating witness," Corey Hilton, "whose four bullets were in the center of mass of the de[cede]nt." Rudasill testified that if Truesdale had told

him "that he was going to testify that he was a big time drug dealer," he "would have told him not to testify to that."

The judge orally denied Truesdale's § 23-110 motion, explaining that, as to Truesdale's "claim that Rudasill . . . did not adequately prepare him for his testimony at trial, the Court does not credit Truesdale's testimony one bit." Instead, the court credited "Rudasill's testimony that he did, in fact, prepare him for trial and that he was surprised at some of his testimony that came out during the course of the trial," including the testimony that he was a big-time drug dealer making tens of thousands of dollars a week. According to the trial judge, "Truesdale's personality and demeanor came across on the stand," and not always in a good way. But "that was Mr. Truesdale," and "you can't control everything that your client says or doesn't say when they're on the stand." Ultimately, the court concluded "that even assuming any showing of deficient performance" as defined in the Supreme Court's decisions on ineffective assistance of counsel, "[t]he government's case was strong," and there was no showing that any errors "affected the outcome in this case."

## III. Analysis

The right to the effective assistance of counsel—"the means through which the other rights of the person on trial are secured"—is guaranteed by the Sixth Amendment to the U.S. Constitution. *Dugger v. United States*, 295 A.3d 1102, 1110

(D.C. 2023) (quoting *United States v. Cronic*, 466 U.S. 648, 653 (1984)). To succeed on a claim of ineffective assistance of counsel, a defendant must first establish that his lawyer's performance was deficient and then demonstrate that those inadequacies prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Both the deficiency and prejudice inquiries are mixed questions of law and fact. *Cosio v. United States*, 927 A.2d 1106, 1123 (D.C. 2007) (en banc). While we defer to findings of fact that are supported by the record, the trial court's "ultimate deficiency and prejudice determinations are legal in nature and are reviewed de novo." *Dugger*, 295 A.3d at 1111. Here, the trial court specifically credited some of Rudasill's testimony and did not specifically discredit any of it. For purposes of our Sixth Amendment analysis, we accept Rudasill's testimony and defer to the trial court's findings about it except where they cannot be squared with the record or with Rudasill's own testimony. Our analysis does not rely on Truesdale's discredited testimony.

## A. Deficient Performance

Truesdale challenges Rudasill's effectiveness on various grounds, pointing, among other things, to his failure to file any motions to suppress or motions in limine, to conduct sufficient factual investigation or any legal research, to adequately prepare Truesdale to testify, and to adequately prepare *himself* to effectively carry

out Truesdale's direct and rebuttal examinations. To satisfy the deficiency prong of the *Strickland* analysis, Truesdale must show that Rudasill's "representation fell below an objective standard of reasonableness." *Cosio*, 927 A.2d at 1123 (quoting *Strickland*, 466 U.S. at 688).

We focus our analysis on Truesdale's contention that Rudasill was deficient in his overall handling of Truesdale's trial testimony, which was likely the most consequential of the errors Truesdale alleges and which implicates some of Truesdale's other allegations of poor lawyering as well. In trials like Truesdale's that largely boil down to a credibility contest, the "failure to adequately consult with and prepare [one's] client to testify" can constitute deficient representation. *See Turner v. Duncan*, 158 F.3d 449, 457 (9th Cir. 1998) (holding that counsel's "cursory consultation" with Turner was deficient performance and "especially shocking in light of the seriousness of the charges against [him]," the fact that Turner's "entire defense" hinged on subjects he testified about, and "that Turner testified in a manner that suggests he was wholly unprepared to answer questions on cross-examination").[5] "This court has emphasized that a defendant is entitled to

---

[5] *See also Vaughn v. United States*, 93 A.3d 1237, 1272 (D.C. 2014) (holding that meeting with a defendant "several times prior to trial" and "conduct[ing] mock cross-examinations" is "well within the range of reasonable attorney performance");

adequate preparation by, and consultation with, counsel" and that such preparation is one of the most important elements of the effective assistance of counsel. *Portillo v. United States*, 62 A.3d 1243, 1252 (D.C. 2013) (quoting *McFadden v. United States*, 614 A.2d 11, 13-14 (D.C. 1992)).

As a threshold matter, Rudasill's apparent confusion over what the government had to prove to convict Truesdale of the felony murder charge is the kind of mistake that could dramatically skew any lawyer's decisionmaking, including the advice he gives about whether and how his client should testify. As noted above, Rudasill testified at the § 23-110 hearing that he told Truesdale that he was potentially liable for felony murder "because the underlying purpose of the behavior that he admitted to constituted a felony purchase of narcotics marijuana." He later repeated that Truesdale "was legally culpable" for his role "in a felony narcotics purchase." But the alleged felony underlying Truesdale's felony murder

---

*Arthur v. United States*, 986 A.2d 398, 406 (D.C. 2009) (concluding that defense counsel "has the primary responsibility for advising the defendant of his right to testify and for explaining the tactical implications for doing so or not" (quoting *United States v. Ortiz*, 82 F.3d 1066, 1070 (D.C. Cir. 1996))); *Lane v. United States*, 737 A.2d 541, 551 (D.C. 1999) (dismissing claim that trial lawyer was ineffective for inadequately preparing defendant to testify where an "uncontroverted affidavit established that [the trial lawyer] met with [defendant] on numerous occasions to prepare his testimony and to discuss impeachment and cross-examination"); *Lee v. United States*, 769 F. Supp. 3d 706, 720 (E.D. Mich. 2025) (stating that a defense attorney is "obligated to prepare [his client] for his testimony" (quoting *Rayborn v. United States*, 489 F. App'x 871, 881 (6th Cir. 2012))).

charge was armed robbery, not drug dealing, and according to Truesdale's testimony at trial, he had a defense to that, which Rudasill presumably knew or should have known: Truesdale was innocent of robbery because he thought Hilton was purchasing marijuana, not stealing it. *See* D.C. Code § 22-2101 (listing robbery among the enumerated felonies supporting a felony murder charge); *see also Robinson v. United States*, 100 A.3d 95, 109 & n.34 (D.C. 2014); *Kitt v. United States,* 904 A.2d 348, 355 (D.C. 2006). The indictment did not charge Truesdale with a drug offense—felony or misdemeanor—and did not identify any statutorily enumerated felony drug offense as having played a role in or been causally connected to the alleged felony murder. Nor did the jury instructions require the jurors to find that Truesdale had committed a felony drug offense. Contrary to Rudasill's repeated statements at the § 23-110 hearing, Truesdale could not have been found guilty of felony murder based upon his plan to purchase marijuana from Godsey.

Whether this lapse stemmed from Rudasill's seeming failure to conduct any legal research in advance of trial or simply from being spread too thin after trying back-to-back trials for so many years, the failure to grasp what proof is required for the main offense for which one's client is being prosecuted amounts to deficient performance, potentially affecting the most critical decisions an attorney makes prior

to and during a criminal trial. "An attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland*." *Hinton v. Alabama*, 571 U.S. 263, 274 (2014); *see also Richardson v. United States*, 318 A.3d 490, 497 (D.C. 2024) (declining to defer to a purportedly strategic decision by counsel that "was grounded in an unreasonable mistake of law"). Notably, Rudasill's misunderstanding explains his testimony at the § 23-110 hearing that he thought jury nullification might be Truesdale's only hope for acquittal.[6] *See* Hr'g Tr. at 13, Oct. 24, 2018 (Rudasill testifying that even though Truesdale was essentially admitting guilt of a felony drug offense, perhaps a jury might still acquit

---

[6] Even assuming a trial lawyer's decision to present a jury nullification defense is not always deficient performance, it is surely deficient when the lawyer is wrong about the necessity of resorting to such a defense, such as here, where Rudasill mistakenly believed that "the behavior that [Truesdale] admitted to"—buying a pound of marijuana—qualified as the predicate felony for felony murder. Simply playing to the jury's sympathies does not address—much less counter—any of the elements the government must prove. Thus, this court has repeatedly denied defendants' requests for a jury-nullification instruction and upheld convictions where "the trial court instructs the jury that it is obligated to find the defendant guilty if the government meets all the elements of the charged offense." *Reale v. United States*, 573 A.2d 13, 15 (D.C. 1990); *see also Farina v. United States*, 622 A.2d 50, 60-61 (D.C. 1993) ("While acknowledging that '[n]o doubt juries sometimes act out of compassion and in disregard of the law,' this court has concluded that it 'will not place upon such conduct by juries the stamp of judicial approval through instruction from the court.'" (quoting *Arshack v. United States*, 321 A.2d 845, 851 (D.C. 1974))).

him of felony murder "if it was demonstrated that he was not an actual shooter").[7] The true effect of Rudasill's misunderstanding is hard to discern because Rudasill did not explicitly invite the jury to defy its instructions and still argued that Truesdale should be acquitted because he was not guilty. At the very least, Rudasill's belief—however illusory—that Truesdale's prospects were so dire diverted attention from Truesdale's innocent-presence defense and affected the calculus over whether Truesdale should risk taking the stand.

---

[7] The government argues that Rudasill did not adopt a jury nullification defense, that he actually advised Truesdale against a proposed jury nullification defense, and that "Rudasill's theory of defense at trial was that appellant was not vicariously liable for the murder because he was responsible for the drug purchase, not the robbery or the resulting murder." In support of this argument, the government cites to three pages in the 23-110 hearing transcript: On the first cited page, Rudasill testified that he told Truesdale "there's a situation [sic] the jury nullification. We present all the facts and the jury finds there's a party more culpable than you and therefore, they don't convict you because there's inherent unfairness in the government prosecutorial decision." On the second cited page, Rudasill testified, "I saw a narrow window of opportunity to argue that even though he was legally culpable as a co-conspirator in a felony narcotics purchase, that a jury would not hold him responsible if it was demonstrated that he was not an actual shooter." And on the final page the government cites, Rudasill testifies that he "was trying to establish that Mr. Truesdale was the least culpable of the people involved in that whole exchange of gunfire in that stairway." Each of these citations supports rather than undermines the conclusion that Rudasill's theory of defense at trial was, in effect, my client is guilty but you should acquit him anyway. *See also* 02/13/2012 Tr. at 48 (Rudasill urging the jury in closing argument "to scrutinize this evidence for what it's worth and accept Corey Hilton's testimony that he's the one that killed Calvin Godsey. He's the one that put those bullets in him and all the ballistics evidence are consistent with one shooter and one killed.")

What is easier to discern is the consequence of Truesdale's less than effective turn on the witness stand and Rudasill's role in the way that testimony played out. The trial court expressed no doubt that Truesdale's tack of presenting himself as a big-time drug dealer was chancy and ineffectual—at one point noting that the strategy allowed the prosecutor to score points in closing argument by asking the jury why Truesdale was "living with his mama" and did not own a car if he actually was a big-time drug dealer who made $30,000 a week and shopped at Gucci. The trial court was mistaken, however, in its view that the fallout from the strategy was Truesdale's own fault. According to the court, Rudasill himself was surprised by Truesdale's testimony and rather than "giv[ing] up his client," Rudasill had to "put on [his] game face" and "roll with it as if it was planned."

Contrary to the trial court's ruling, Rudasill did not unequivocally state that Truesdale's testimony in this respect had caught him off guard.[8] Although Rudasill

---

[8] Although we generally defer to a trial "judge's factual findings anchored in credibility assessments derived from personal observations of the witness[] . . . . not all credibility determinations are equal," *Stringer v. United States*, 301 A.3d 1218, 1227-28 (D.C. 2023), and Rudasill's testimony that he did not anticipate Truesdale's testimony about being a "big time drug dealer" amounts to the sort of inconsistency that demands skepticism, *id.* at 1228 (A witness's story "itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it." (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985))); *id.* ("[I]n such circumstances, we 'may well find clear error even in a finding purportedly based on a credibility determination.'" (quoting *Anderson*, 470 U.S. at 575)).

testified that Truesdale "didn't tell [him] that he was going to testify that he was a big time drug dealer," he also said Truesdale told him that he "didn't deal with that low-level penny-ass stuff," that "he was like a business man," and that "selling weed was not his thing. . . . [H]e wasn't at that level in the game as they structure the business models on the street." And when the prosecutor explicitly asked Rudasill if he could single out an aspect of Truesdale's trial testimony that did surprise him, Rudasill identified something unrelated.[9]

More fundamentally, Rudasill's actions at trial demonstrated that Truesdale's testimony that he made $20,000 to $30,000 each week dealing drugs was an integral part of Rudasill's trial strategy from the get-go. Contrary to his assertion at the hearing that he would have advised Truesdale against the big-time-drug-dealer storyline, Rudasill expressly asked Truesdale on direct examination "what type of drugs [he was] selling," how much profit he would make selling 50 grams of heroin, and "how much money [he was] making a week." He also foreshadowed that testimony during his opening statement when he told the jury that Truesdale "sold drugs" and had "always had money" and when he asked Hilton whether he knew

---

[9] Rudasill stated instead that Truesdale surprised him by testifying at trial that he briefly got out of the car (and that's when he must have dropped his phone), when Rudasill thought he would say he had remained in the van the whole time.

Truesdale "as a person that gets money" and who gave Hilton the money to buy a cell phone.[10] It is thus clear from the record that Truesdale's testimony about his high-level drug dealing was not out of the blue, but an intentional strategy Rudasill contemplated from the start.

In another case, under the right circumstances, such a trial strategy (essentially, "I'm a criminal but not *that* kind of criminal") might conceivably be reasonable where counsel can precisely convey the exculpatory point while containing the prejudice.[11] It was not reasonable here, in concept or in execution. The strategy was already fraught because inherent to the theory—and inherent to the government's inevitable impeachment of the theory—was that Truesdale had a particularly extensive criminal past. *See Ohler v. United States*, 529 U.S. 753, 757 (2000) ("[O]nce the defendant testifies, she is subject to cross-examination,

---

[10] Other aspects of Rudasill's hearing testimony call into question his credibility. For example, Rudasill testified that Truesdale was shot during the incident and that his defense theory was to make Truesdale appear to be the least culpable of the men who were shooting guns. But there was no evidence that Truesdale was shot, and at trial he testified (and Rudasill argued) that he was not at the scene when the shooting occurred. These inconsistencies between Rudasill's testimony and what actually happened at trial are perhaps explained—at least in part—by his "cerebral vascular accident," which affected his memory, and the "cumulative stress disorder" that he suffered around the time of Truesdale's trial.

[11] Motions in limine could be a useful tool for knowing and limiting the strategy's risks.

including impeachment by prior convictions, and the decision to take the stand may prove damaging instead of helpful."); *Smith v. Regan*, 583 F.2d 72, 76-77 (2d Cir. 1978) (concluding that it would have been "unwise" for counsel to suggest that defendant testify in his own defense given the defendant's multiple prior criminal convictions). Evidence of a defendant's prior convictions "is always . . . prejudicial to a defendant" and "diverts the attention of the jury from the question of the defendant's responsibility for the crime charged to the improper issue of his bad character." *Eady v. United States*, 44 A.3d 257, 265 (D.C. 2012) (quoting *United States v. Jones*, 67 F.3d 320, 322 (D.C. Cir. 1995)). The strategy entailed Rudasill questioning Truesdale about multiple serious crimes he had committed and was continuing to carry out around the time Godsey was killed. A pair of puzzling followup questions then led to Truesdale's irrelevant and yet highly damaging testimony that he had served time in prison.[12] And ultimately Truesdale's responses opened the door—predictably—to evidence of even more bad acts when the

---

[12] The prosecutor herself objected on relevance grounds to Rudasill's question whether Truesdale had served time in jail for one of his felony convictions. *See Proctor v. United States*, 343 A.3d 592, 606 (D.C. 2025) (acknowledging the possibility of "increased prejudice caused by" reference to prior incarceration as compared to stipulations relating to past convictions); *Curry v. United States*, 322 A.2d 268, 270 (D.C. 1974) (concluding that government's questioning of defendant about his prior time in prison was not impermissible because it "was merely repetitious of his own testimony on direct that he had been in Lorton more than once").

prosecutor impeached him with a string of prior arrests, including a case that was pending at the time of the trial here. As a result of Rudasill's apparent failure to accurately assess the plausibility of this line of questioning and to prepare Truesdale accordingly, the prosecutor effectively impeached Truesdale with evidence that he was actually *not* too big-time to bother with robbing a marijuana dealer—he was just someone who spent a lot of time around drugs and guns. As she put it in closing argument, he "lives with his mother," he "can't pay his cell phone bill on time," and he's "only ever been arrested for street-level cocaine and marijuana dealing, never for heroin or PCP dealing[]."

Any defendant who takes the stand can expect to be confronted with prior convictions of felonies involving dishonesty.[13] Rudasill's introduction of the big-time-drug-dealer theme, however, made the entirety of Truesdale's convictions and arrests relevant and therefore allowed the prosecutor to inflict damage that far exceeded what would normally result from the impeachment of a testifying

---

[13] Criminal offenses may be introduced to impeach a witness only if the witness was convicted of the offense and the offense "was punishable by death or imprisonment in excess of one year" or "involved dishonesty or false statement." D.C. Code § 14-305(b)(1). The prior conviction may be introduced only "for the purpose of showing him as lacking credibility" and not "to prove general disposition to commit crime or a specific crime." *Ward v. United States*, 386 A.2d 1180, 1182 (D.C. 1978).

defendant's credibility based on past crimes.

Further, in failing to prepare and to execute a strategic direct examination, Rudasill forfeited opportunities to mitigate the prejudice stemming from Truesdale's prior convictions and walked headlong into avoidable snares. The trial court credited Rudasill's testimony regarding the steps he took to prepare Truesdale to testify and did not credit Truesdale's testimony that he did not want to testify but Rudasill persuaded him to take the stand. We find no clear error in this particular aspect of the court's ruling. But in certain respects—much the same as our conclusion that Rudasill was not surprised by Truesdale's testimony about his drug dealing—the inadequacy of Rudasill's preparation is inescapable based on Rudasill's own testimony and how things played out at trial. *See supra* note 10. Rudasill's credited testimony was, for example, that he did not practice cross-examining Truesdale and did not go through all the questions he anticipated the prosecutor would ask his client. He seemingly did not tell Truesdale what specific questions he himself planned to ask him on direct examination. Rudasill also did not say that he gave any feedback to Truesdale about his testimony, discussed Truesdale's prior convictions with him, or advised Truesdale about how to behave on the stand. The trial court's crediting of Rudasill's testimony about the steps he took to prepare Truesdale is thus not tantamount to a conclusion that Rudasill's

preparation was adequate. Faced with a case so dependent on witness credibility, a competent trial lawyer would have thoroughly worked through his client's testimony with him before calling him as a witness. *See Fatumabahirtu v. United States*, 148 A.3d 260, 264 (D.C. 2016) ("Competent trial counsel would have gone over [his client's] testimony with her prior to putting her on the witness stand and thus would have been aware that she denied selling" drug paraphernalia to officers.)

Once his client was on the stand, Rudasill did no better. It is, of course, a "legitimate defense tactic to elicit during the direct examination of a defense witness, including the defendant, the witness'[s] prior convictions in order to lessen the potential impact of the government's use of such evidence as impeachment." *Dyson v. United States*, 450 A.2d 432, 442 (D.C. 1982); *see also Beale v. United States*, 465 A.2d 796, 800 (D.C. 1983). But it may still require "careful attention" to avoid the significant prejudice associated with the admission of past crimes evidence. *Erlinger v. United States*, 602 U.S. 821, 849 (2024). Attorneys have many tools at their disposal to minimize the harm attendant to other-crimes evidence: They generally can (and should) ask leading questions about undisputed specific criminal convictions, avoid any discussion of penalties associated with those convictions, and request a jury instruction about the proper use of past convictions. *See Coates v. United States*, 558 A.2d 1148, 1149-50 (D.C. 1989); *Proctor*, 343 A.3d at 606.

Rudasill did not adopt these strategies. At times Rudasill acknowledged that allowing the jury to hear about Truesdale's criminal record was bad for him—in one instance, he pledged to "try to avoid further pratfalls" when the trial judge had to stop him from referring again to Truesdale's pending case. But Rudasill never asked the court for a limiting instruction.[14] *See Dixon v. United States*, 287 A.2d 89, 99-100 (D.C. 1972) ("[T]he omission altogether of any cautionary instruction on a prior conviction admitted for impeachment would seem to affect defendants' substantial rights, unless it could be shown under the facts of the particular case that such omission was harmless."). Further, by asking Truesdale open-ended questions about whether he had "been previously convicted of a felony offense" and by eliciting only a fraction of those convictions, Rudasill left Truesdale vulnerable to the government's more trenchant questioning about the myriad prior felony convictions that Rudasill had not asked about—and Truesdale had not mentioned. Truesdale thus came across as either trying to hide those initially omitted convictions or having

---

[14] In Truesdale's direct appeal, the government even conceded that the trial court erred (though in its view harmlessly) by not sua sponte instructing the jury to consider Truesdale's prior convictions only in evaluating his credibility as a witness generally and not as evidence of his guilt otherwise. *See Truesdale v. United States*, No. 12-CF-1307, Mem. Op. & J. at 18-19 (D.C. June 7, 2017) (addressing a number of challenges to the admission of evidence of Truesdale's prior convictions and arrests, stating that "[a]ll of these claims of error were forfeited in the trial court and therefore are subject to review only for plain error," and holding that Truesdale had for various reasons failed to demonstrate plain error).

trouble remembering his priors because he had so many. *See Thompson v. United States*, 546 A.2d 414, 419 (D.C. 1988) ("[O]ther crimes evidence may 'result in casting such an atmosphere of aspersion and disrepute about the defendant as to convince the jury that he is a habitual lawbreaker who should be punished and confined for the good of the community.'" (quoting *Pinkney v. United States*, 363 F.2d 696, 698 (D.C. Cir. 1966))).

And while Rudasill's handling of Truesdale's testimony stands out among Rudasill's deficiencies, it was exacerbated by a steady stream of mistakes that undermined confidence in the defense theory and in Rudasill himself. The following are a few examples of these lapses, most of which could have been avoided or mitigated by better preparation or by litigating evidentiary matters pretrial. (1) During opening statements, Rudasill asserted facts that he would not be able to support with evidence, causing the trial court to interrupt proceedings to direct the jury to disregard Rudasill's statement. (2) Right before Cook took the stand, Rudasill (unsuccessfully) sought more time because he had not reviewed Cook's video statement and other materials and was not prepared to cross the witness. (3) Unable to lay the foundation for an excited utterance through his client's testimony, Rudasill was forced to give up on eliciting statements from Cook asking Hilton "why the fuck did you do that" immediately after the shooting. (4) Rather

than make his own legally supported judgment calls about when to object at trial, Rudasill repeatedly explained that he was objecting because Truesdale had asked him to. (5) During closing argument, Rudasill misstated the standard for reasonable doubt, misstated the government's burden (and took that burden onto the defense), incorrectly framed the jury instructions, and inaccurately characterized Cook's testimony.

"The proper function of the adversarial process demands appropriate investigation and preparation by counsel," and we must take care "not to slap the label of objective reasonableness on fanciful or unrealistic rationalizations for an attorney's conduct." *Cosio*, 927 A.2d at 1123, 1127. Here, it would be unrealistic to describe Rudasill's handling of Truesdale's testimony as anything other than deficient, particularly when Rudasill seemingly took no steps to minimize the prejudice and risk inherent in the trial strategy and affirmatively undermined the defense with his many other missteps.

**B. Prejudice**

We next consider whether Truesdale can demonstrate a reasonable probability of a different result in the absence of Rudasill's deficient performance. *Cosio*, 927 A.2d at 1131-32 (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466

U.S. at 694. "[W]here there are multiple alleged deficiencies, we evaluate whether the 'cumulative impact' of the deficiencies prejudiced the defendant." *Dugger*, 295 A.3d at 1111 (quoting *Gardner v. United States*, 140 A.3d 1172, 1197 n.38 (D.C. 2016)).

As an initial matter, "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Strickland*, 466 U.S. at 696. Though the trial court here characterized the evidence against Truesdale as strong, the defense had a path to avoid conviction if one juror were persuaded to believe Truesdale's account over that of Cook and Hilton. *See Wiggins v. Smith*, 539 U.S. 510, 537 (2003) (finding prejudice where "there is a reasonable probability that at least one juror would have struck a different balance"); Super. Ct. Crim. R. 31(a) ("The verdict must be unanimous."). Neither Cook nor Hilton was an ideal government witness. They both initially lied to officers—Hilton testified that he "didn't want to admit to what [he] had done" and wanted to "find a way to get out of it" and Cook said he was worried about "the way it looked." By testifying for the government, they both did, at least partially, "find a way to get out of" the consequences they feared.

This was not a small problem for the government. The prosecutor acknowledged in her opening statement that because the government had given both

Cook and Hilton "benefits in this case in exchange for their testimony," the jury should "consider their testimony with caution." *See also* Trial Tr. 23, Dec. 16, 2011 (prosecutor stating at a pretrial hearing that the government would "be relying on the testimony of a cooperator and the testimony of an individual who was involved in the case and as the Court and everybody in the courtroom is aware, there's always substantial bias involved."). The court echoed this advice in its instruction to the jury. Indeed, witnesses who have "bartered for some sort of consideration in return for" their testimony can make the government's case weaker rather than stronger because the jury is unlikely to trust them. Stephen S. Trott, *Words of Warning for Prosecutors Using Criminals as Witnesses*, 47 Hastings L.J. 1381, 1388 (1996); *cf. Dugger*, 295 A.3d at 1120 ("As the Supreme Court has noted, '[j]urors suspect informants' motives from the moment they hear about them in a case, and they frequently disregard their testimony altogether as highly untrustworthy and unreliable.'" (quoting *Banks v. Dretke*, 540 U.S. 668, 702 (2004))).

In addition to their bias, Cook's and Hilton's testimony was marred by their markedly different accounts of the offense. Most significantly, they gave different descriptions of how the robbery and shooting began: Hilton testified that Truesdale initiated the robbery by asking him for the money and said that he was talking to Cook and standing with his back to Godsey and Truesdale when he heard Truesdale

start firing at the decedent. Cook, in contrast, said that Hilton asked *Truesdale* for the money, adding that Hilton and Godsey began tussling over the marijuana and "that's when the defendant shot two or three times." Cook and Hilton also disagreed about who brought the sample of marijuana back to Truesdale (each man said the other carried it) and the order in which the men entered the building on the second trip (Cook said that Truesdale entered last as Godsey was closing the door, while Hilton said that Truesdale led the way).[15]

Other than their often inconsistent testimony, there was not a lot to substantiate Cook and Hilton's assertion that Truesdale took part in the robbery and shooting. The government introduced no physical evidence directly linking Truesdale to the stairwell where the shooting occurred,[16] and the other eyewitnesses'

---

[15] Cook and Hilton testified inconsistently about more minor matters as well, such as what and when Hilton communicated to Cook about the marijuana (Hilton testified that he told Cook on the way to Godsey's home that the marijuana was for Truesdale and the driver, while Cook said he learned *after* they were in Godsey's apartment building that Truesdale and *Hilton* were splitting the marijuana) and what happened when they first arrived at Godsey's building (Hilton said Truesdale stepped out of the vehicle but Cook stopped him from coming inside, while Cook said that Truesdale remained in the car the whole time).

[16] Although the government did introduce Truesdale's cell phone at trial, that phone was found outside in the grass and thus did not place Truesdale in the building. And the government's argument that the presence of .380 casings at the scene implicated Truesdale was based solely on Hilton's testimony that Truesdale

testimony could be reconciled with Truesdale's defense. Kenneth Colbert (the man working on a car at the time of the shooting) testified that Truesdale was *not* one of the men running away after shots were fired and Steven Dantignac (Cook's friend) said he "believed" that Cook had said two men had shot at him—but not who those men were. The conspicuous weaknesses in the government's case may explain why part way through their deliberations, the jurors sent a note requesting that the court elaborate on the term "reasonable doubt." *See State v. Hammell*, 653 A.2d 1122, 1124 (N.H. 1995) (jury question about reasonable doubt standard could suggest "that the jury was confused as to what they should do if they found that the State had not met its burden of proof").

This was therefore not a case where Truesdale's only hope for acquittal was through his own testimony. With an accurate understanding that his client faced felony murder for his alleged involvement in the robbery in the stairwell—and not, as Rudasill testified at the § 23-110 hearing, his admitted marijuana deal—Rudasill had the option of a straightforward defense that highlighted the many reasons to doubt the government's narrative while forgoing the hail-Mary big-time-drug-dealer

---

possessed an extremely common type of firearm that uses .380 ammunition. *See* Michael P. O'Shea, *The Concrete Second Amendment: Traditionalist Interpretation and the Right to Keep and Bear Arms*, 26 Tex. Rev. L. & Pol. 103, 145 (2021) (describing .380 caliber as a common ammunition chambering for compact handgun designs).

strategy (and the heap of prejudice that came with it). There was an ample basis in the record—without Truesdale's testimony—for counsel to argue forcefully that Truesdale was not in on the robbery of the marijuana dealer. *Cf. Farmer v. United States*, 341 A.3d 1131, 1140, 1149 (D.C. 2025) (defendant had "substantial support for his insanity defense" even though he did not testify); *Gray v. United States*, 589 A.2d 912, 917 (D.C. 1991) ("It is possible, therefore, for a defendant to rely on self-defense, based on circumstantial evidence of reasonable fear of imminent serious bodily injury, without the defendant's own testimony."). The lack of physical proof that Truesdale was in the stairwell when the shooting occurred aligned with the evidence (1) that Godsey sought to exclude Truesdale, who unlike Hilton, was a stranger to both Godsey and Cook, and (2) that multiple rounds were fired within the tight area of the building lobby, yet Truesdale—if he was in fact there—was the only person to walk away unharmed, (3) that Kenneth Colbert said Truesdale was not one of the fleeing suspects, and (4) that Hilton and Cook differed as to very specific facts involving Truesdale's role and had such strong incentives to place the blame elsewhere. The text messages in which Cook and Godsey—and not Truesdale—were arranging the sale were also consistent with Truesdale's innocent-presence defense.

Alternatively, a better prepared Truesdale could have testified in a way that challenged Hilton and Cook's accounts and minimized the opportunities for the government to discredit him. But instead, the incoherence of Rudasill's defense on Truesdale's behalf obscured the weakness of the government's case. Rudasill's repeated unforced errors handed the government the chance to skewer Truesdale's credibility—"a central issue" in a case where "the only evidence presented" by the defense is "his own testimony at trial." *Turner*, 158 F.3d at 458. If Rudasill had asked yes-or-no questions directing Truesdale through his entire criminal history, then the government would not have impeached him with the crimes he forgot to mention—making him look like "a lying liar." *Jones v. United States*, 263 A.3d 445, 456 (D.C. 2021). If Rudasill had not asked Truesdale about his weekly income and his career as a drug dealer, then the government would not have impeached him with his many previous arrests and the evidence that he was not really that big-league and not really that rich. And in the absence of Rudasill's questions about the time Truesdale spent in jail for at least two of his prior convictions, the jury would not have focused on his time in prison—a fact that likely made him appear, at least to some jurors, as a "bad m[a]n." *See United States v. Tucker*, 12 F.4th 804, 823 (D.C. Cir. 2021).

Whether he testified or not, Truesdale had a viable defense, and given the multiple reasons a juror might harbor a reasonable doubt about Truesdale's involvement in the robbery and shooting, Rudasill's deficient performance undermines our confidence in the verdict. "It is no answer to argue that" Truesdale's credibility might have suffered regardless of the preparation offered by his counsel. *See Cosio*, 927 A.2d at 1134. "That cannot be said with any level of confidence, inasmuch as the record does not reveal how" he would have responded to well conducted and tactically prepared direct examination. *Id.*

Considering together the instances of Rudasill's deficient performance, particularly those mistakes affecting Truesdale's testimony, we conclude that "there is a reasonable probability that [Rudasill's] deficiencies tilted the balance in the government's favor, and that but for his unprofessional errors, there is a reasonable probability that the jurors would not have convicted" Truesdale. *Dugger*, 295 A.3d at 1120.

## IV.

For the foregoing reasons, we reverse the trial court's denial of Truesdale's § 23-110 motion and remand for further proceedings consistent with this opinion.

*So ordered*

BLACKBURNE-RIGSBY, *Chief Judge*, dissenting: I respectfully dissent. The government presented a case that was strong and the strength of its case was not derived from deficiencies on the part of Mr. Truesdale's counsel, Mr. Rudasill. The strength of the government's case negates the reasonable probability that the outcome of Mr. Truesdale's trial would have been different.

As a threshold matter, when assessing whether an alleged deficiency created a reasonable probability that the outcome of a trial would have differed, we must consider the strength of the government's case. *See, e.g., Dugger v. United States*, 295 A.3d 1102, 1119-20 (D.C. 2023). This analysis must also assess whether "the strength of the government's case may itself be a product of trial counsel's ineffectiveness." *Shepherd v. United States*, 296 A.3d 389, 396 n.9 (D.C. 2023) (quoting *Rice v. United States*, 580 A.2d 119, 122 (D.C. 1990)). Here, the strength of the government's case derived from the testimony of the government's witnesses, as well as other corroborative evidence. The government did not bootstrap its case on the back of counsel's errors. Therefore, even assuming deficient performance of counsel, Mr. Truesdale cannot show prejudice. "[W]e need not determine whether [appellant's] trial counsel rendered constitutionally deficient representation because we are convinced that [appellant] has not shown a reasonable probability or a substantial likelihood that the outcome of the proceeding against him would have

been different." *Gardner v. United States*, 140 A.3d 1172, 1196 (D.C. 2016) (citing *Strickland v. Washington*, 466 U.S. 668, 697 (1984)).

Despite the strong testimonial evidence of the government's three key witnesses, the majority minimizes or ignores significant testimony, claiming that the testimony of two of the government's witnesses is biased because there are some inconsistencies. However, key parts of the testimonies of these witnesses *is consistent and incriminating* and is further bolstered by other evidence. Mr. Cook and Mr. Hilton both testified that Mr. Truesdale accompanied them the second time they walked from the van to the victim, Mr. Godsey's, apartment building, where the robbery and shooting took place. Mr. Hilton testified that Mr. Truesdale carried a .380-caliber handgun that he took out and aimed at Mr. Godsey during the robbery. Both Mr. Cook and Mr. Hilton testified that Mr. Truesdale aimed the gun at Mr. Godsey and said either, "You know what time it is," or "You know what this is, give it up," and started shooting at Mr. Godsey. Both Mr. Hilton and Mr. Cook were also shot—Mr. Hilton by his own gun and Mr. Cook by Mr. Truesdale. Both Mr. Cook and Mr. Hilton testified that after the shooting, Mr. Truesdale grabbed the marijuana and ran back to the van accompanied by Mr. Hilton. This is strong and, critically important, *consistent testimony* from two of the government's witnesses.

Further, Mr. Colbert, an independent third witness, saw two men he did not

recognize running from the direction of the shooting toward the van, and he testified that *only the driver* was in the van at that time. The majority raises Mr. Colbert's in-court inability, nearly two years after the shooting, to identify Mr. Truesdale as one of the two men he saw running from the scene in support for the theory that Mr. Truesdale was not involved in the shooting. However, Mr. Colbert's testimony two years after the shooting does not contradict or negate his earlier statement from the day of the shooting, in which he told the police that he could not identify either man and that he did not recognize either of them as people he had seen prior to that day. Mr. Colbert further testified that he "didn't really see" and "didn't really get a good view of" one of the two men and could not provide details about the second man, other than to say that he had not seen either of the two men before. Moreover, Mr. Colbert definitively stated that Mr. Cook, who he *did* know by sight from "the Third Street area," was *not* one of the two men running towards the van. Mr. Colbert also testified that he did not see anyone get out of the van to run towards and render aid to the two men running to the van. Mr. Colbert's testimony flatly contradicts Mr. Truesdale's claims that Mr. Cook (and not Mr. Truesdale) was one of the two men running to the van, that Mr. Truesdale remained in the van with the driver during the robbery and shooting, and that Mr. Truesdale only left the van to help Mr. Cook and

Mr. Hilton as they approached.[1] Instead, Mr. Colbert's testimony corroborates the testimony of Mr. Hilton and Mr. Cook: that two, and not three, men ran from the building to the van after the shooting and that Mr. Cook was not one of the two men. Additionally, Mr. Truesdale's testimony that he remained in the car the entire time was further contradicted by the fact that he testified that he dropped his cell phone when he stepped out of the van. Therefore, Mr. Colbert's testimony bolstered Mr. Cook and Mr. Hilton's testimony and flatly contradicts Mr. Truesdale.

Cellphone evidence from Mr. Godsey's phone led the police to Mr. Cook, who in turn led the police to Mr. Hilton. The police recovered a phone in a grassy area outside Mr. Godsey's apartment building, which belonged to Mr. Truesdale. The police obtained search warrants for Mr. Hilton and Mr. Cook's phones and discovered texts and calls between the two of them and texts and calls between Mr. Cook and Mr. Godsey. Cell-site location data from Mr. Truesdale's recovered phone also corroborated Mr. Hilton's and Mr. Cook's accounts of their movements. The police also recovered a bullet and bullet fragments, a digital scale, and thirteen

---

[1] Additionally, Mr. Colbert described an accident that occurred down the street involving an unrelated vehicle about five minutes prior to the shooting, stating that the van was parked on the street at the time and that the driver got out to look at it. However, in Mr. Truesdale's account of the time he was allegedly waiting in the van for Mr. Hilton and Mr. Cook to return with the purchased marijuana, he did not mention witnessing a car accident.

cartridge casings from the scene as well as five bullets and one bullet fragment from Mr. Godsey's body. The cartridge casings and bullets were determined to have been fired by a 9mm handgun and a .380-caliber handgun, the type of gun Mr. Hilton testified that Mr. Truesdale was carrying. This combined physical evidence—the cell-phone location data, timeline of calls, text messages, bullets from two specific types of guns, and the presence of the digital scale on the stairs—corroborates the accounts of Mr. Hilton and Mr. Cook.

Notwithstanding the consistent testimony and corroborating evidence, the majority argues that the inconsistencies in Mr. Cook and Mr. Hilton's accounts and their biased incentives due to their cooperation agreements in return for their testimony, undermine the strength of their testimony. I disagree. The jury was aware of the inconsistencies in their testimony and of the cooperation agreements that Mr. Cook and Mr. Hilton received. Despite this, the jury convicted Mr. Truesdale on all counts, presumably crediting the testimony of Mr. Hilton, Mr. Cook, and Mr. Colbert and the corroborating evidence. The inconsistencies in Mr. Cook and Mr. Hilton's testimony that the majority points to as undercutting their testimony are minor, for example, whether Mr. Truesdale was in front of or behind Mr. Cook and Mr. Hilton when walking into the building. A reasonable juror could assess and weigh the testimony of Mr. Cook, Mr. Hilton, and Mr. Colbert and conclude that the consistencies in their testimony are very credible and outweighed any

inconsistencies. This is exactly what a jury or any fact-finder is supposed to do. As this court has said, "[i]t is the role of the fact-finder, in determining a witness's credibility, to consider whether other evidence corroborates or contradicts the witness . . . ." *Thomas v. United States*, 137 A.3d 166, 169 (D.C. 2016). Moreover, "this court is not in a position to substitute its judgment for that of the fact-finder when it comes to assessing the credibility of a witness." *Proctor v. United States*, 343 A.3d 592, 605 (D.C. 2025) (quoting *Robinson v. United States*, 928 A.2d 717, 727 (D.C. 2007)). "Almost without exception, '[t]he determination of credibility is for the finder of fact and is entitled to substantial deference.'" *Carrington v. United States*, 344 A.3d 663, 668 (D.C. 2025) (quoting *Bouknight v. United States*, 867 A.2d 245, 251 (D.C. 2005)); *see also Miller v. United States*, 209 A.3d 75, 77-78 (D.C. 2019) ("Credibility . . . 'is determined by the trier of fact, . . . and this court must defer to its credibility findings if they are supported by the evidence.'" (quoting *Bryant v. United States*, 859 A.2d 1093, 1102 n.13 (D.C. 2004))).

It is not the role of this court to "re-try" the case, making its own credibility assessments and factual findings more than a decade after the trial. This is squarely the purview of the fact-finder. Yet that is exactly what the majority purports to do here—substitute its own credibility determinations and findings for those of the jury and the trial court and thereby downplay the strength of the government's case.

Notwithstanding these efforts, the government's case was strong. The inconsistencies or weaknesses of the government's case were outside Mr. Rudasill's influence and had minimal impact on the jury's determination of guilt.

The majority's substitution of its own credibility and factual findings created a false dichotomy and led to the majority's conclusion that the choice to testify was forced on Mr. Truesdale, such that, but for the deficient performance of his trial counsel, he would either (1) not have testified (and been found, indirectly, more credible than the government's three witnesses) or (2) would have testified but would have avoided the damaging elements of his testimony, including the surprising reveal that he was a "big time drug dealer" and his combative demeanor with the prosecutor during cross-examination. To the contrary, the record supports the trial court's finding that it was likely Mr. Truesdale's desire to testify all along and that, despite preparing his client to testify, Mr. Rudasill was caught off guard by some of Mr. Truesdale's testimony during direct examination. The jury's ultimate decision to not credit Mr. Truesdale's testimony, while crediting the testimony of the government's witnesses, with full knowledge of their biases, cannot fall at the feet of Mr. Truesdale's trial attorney because he did not prevent his client from taking the stand or because he did not anticipate his client's unplanned statements and combative demeanor during his examination. Nor does the majority demonstrate that had these

pitfalls been entirely absent from Mr. Truesdale's testimony, there was a reasonable probability that the jury would not have found him guilty, given the strength of the government's case.[2]

The jury's decision to credit the government's three witnesses and the other corroborating evidence, over Mr. Truesdale's testimony, demonstrates the "strengths of the government's case" against him and undermines the majority's conclusion that there was a reasonable probability that but for his counsel's errors, the result of the proceeding would have been different.  *Dugger*, 295 A.3d at 1119-20 & 1119 n.13; *Strickland*, 466 U.S. at 694.

## A. Preparation for Trial Testimony

The majority holds that Mr. Rudasill's failure to prepare Mr. Truesdale to testify at trial affected the outcome of his case and that, contrary to Mr. Rudasill's testimony at the Section 23-110 hearing, Mr. Rudasill knew that his trial strategy was to paint Mr. Truesdale as a "big time drug dealer."  The majority cites *Vaughn v. United States* for the proposition that meeting with a defendant "several times prior to trial" and "conduct[ing] a mock cross-examination" during pretrial

---

[2] This court has previously determined that assessing the strength of the government's case is critical to assessing ineffective assistance of counsel claims. *See, e.g.*, *Dugger*, 295 A.3d at 1119-20.

preparation is "well within the range of reasonable attorney performance." 93 A.3d 1237, 1272 (D.C. 2014); *see also Lane v. United States*, 737 A.2d 541, 551 (D.C. 1999) (dismissing an ineffective assistance of counsel claim where an "uncontroverted affidavit established that [the trial lawyer] met with [the defendant] on numerous occasions to prepare his testimony and to discuss impeachment and cross examination"). Here, Mr. Rudasill testified that he "talked to [Mr. Truesdale] about his version of the facts and the type of questions he w[ould] be confronted with if he testified," and "[went] over his narrative of the facts and the potential cross-examining questions that [h]e [would] face *every time* that [he] met with [Mr. Truesdale]." Mr. Rudasill testified that they did practice runs in order for him to "get to the essence of his understanding of what case [Mr. Truesdale] wanted to present to the jury." Mr. Rudasill testified that Mr. Truesdale was "very proactive" about his case. Mr. Rudasill also testified that he told his client to accept the plea offer, but that Mr. Truesdale refused, saying "my mother ain't paying you to negotiate a plea offer for me. She paying you to try this case. I want you to try this case and this is the theory I want you to advance before the jury." Mr. Rudasill added that had he known Mr. Truesdale was going to tell the jury that he "was a big

time drug dealer," he would have told him not to testify.[3]  At the Section 23-110 hearing, Judge Jackson found the idea that Mr. Truesdale did not initially want to testify but was somehow persuaded to do so against his wishes by trial counsel to be "patently incredible," stating that  "[t]here was no indication of that at all in this case."  The judge added that, at trial, Mr. Truesdale seemed to him "competent," "did not seem hesitant," and "did not seem unprepared."  The judge also definitively credited Mr. Rudasill's testimony that he met with Mr. Truesdale to prepare him to take the stand and to go over his testimony at trial.  The majority dismisses the trial judge's findings on this issue and contends that Mr. Truesdale's trial performance is evidence enough that he stepped uninformed and ill-advised into the witness stand.  However, the trial judge's findings, which were based on his firsthand observations of Mr. Truesdale's demeanor and presence at trial and his observations of Mr. Rudasill, contradict this conclusion.

According to Mr. Truesdale's testimony at the Section 23-110 hearing, Mr. Rudasill only discussed with Mr. Truesdale the possibility of testifying the night

---

[3] The question of whether Mr. Rudasill pressured Mr. Truesdale to testify at trial was raised in Mr. Truesdale's hearing before the trial court where it found it "patently incredible" that Mr. Truesdale was persuaded by counsel to testify on the eve of trial.  However, the issue was not reraised in Mr. Truesdale's brief to this court.  Yet, the majority seems to presume, based solely on Mr. Truesdale's discredited testimony, that Mr. Rudasill pressured Mr. Truesdale to testify.

before he took the stand, without practicing or reviewing questions likely to be asked during direct or cross-examination. Mr. Rudasill testified that he adequately prepared Mr. Truesdale to testify by "talk[ing] to him about his version of the facts and the type of questions he w[ould] be confronted with if he testified," but that he did not "go through . . . each individual question that [Mr. Rudasill] thought the prosecutor would ask [Mr. Truesdale]." Mr. Rudasill also testified that Mr. Truesdale was "very proactive about his case," going so far as to conduct his own research in the jail law library. In denying Mr. Truesdale's Section 23-110 motion, the trial court credited Mr. Rudasill's testimony and discredited Mr. Truesdale's, noting Mr. Truesdale's assertion that he only testified at Mr. Rudasill's encouragement was "patently incredible." Mr. Rudasill testified that Mr. Truesdale's claim of a single, brief eleventh-hour preparation session was inaccurate, stating that, in fact, there were multiple iterations of preparation and meetings between him and Mr. Truesdale. The trial court credited this testimony. The trial court did not clearly err in crediting Mr. Rudasill's testimony.

In turn, the majority emphasizes a number of "obvious errors and contradictions" in Mr. Rudasill's hearing testimony, including stating twice that Mr. Truesdale was shot without any evidence to that effect; asserting that he advised Mr. Truesdale on a plea deal based on one judge's sentencing record when another judge

was actually presiding; and testifying that he pursued a joint-offender defense even when he also confirmed that Mr. Truesdale had told him he had never left the vehicle. The majority contends that it is permissible for them to conclude that the inconsistencies of Mr. Rudasill's testimony "demand skepticism," potentially to the extent that "a reasonable factfinder would not credit it." *Stringer v. United States*, 301 A.3d 1218, 1228 (D.C. 2023) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985)). Yet disregarding the fact-finder's credibility determination and factual findings is clearly the exception to the rule, and it is not appropriate to apply the exception in this case. We are obligated to respect the trial court's credibility determinations in the absence of clear error. *See Williams v. United States*, 187 A.3d 559, 564 (D.C. 2018) (A trial court's "factual findings anchored in credibility assessments derived from personal observations of the witnesses [are] beyond appellate reversal unless those factual findings are clearly erroneous." (quoting *Caston v. United States*, 146 A.3d 1082, 1099 (D.C. 2016))). Indeed, this court "tend[s] to be more deferential to those [factual] findings by the trial judge which are facilitated by his presence in the courtroom and his ability to observe the players first hand; findings based on documents or other writings merit little deference or none at all." *Byrd v. United States*, 614 A.2d 25, 30 (D.C. 1992). This is a high bar, which Mr. Truesdale has not met. But more importantly, Mr. Rudasill's testimony was consistent, not contradictory, with regards to his

preparation of Mr. Truesdale to testify at trial, as the trial court found.[4] It is therefore unfounded here for the majority to substitute its own credibility and factual determinations for those of the trial court. Furthermore, Mr. Truesdale does not argue that the trial court abused its discretion in finding his own testimony to be non-credible.

In light of the strength of the government's evidence, Mr. Truesdale falls short of demonstrating that Mr. Rudasill's pre-testimony preparation prejudiced the outcome of the trial. Mr. Truesdale acknowledged at the Section 23-110 hearing that, in response to Mr. Rudasill asking him what he would say if he were to testify, he was "specific about it." The majority contends that insufficient preparation for his testimony caused Mr. Truesdale to make basic errors during his testimony that affected the jury's perception of him, including yelling at the prosecutor in front of the jury, incorrectly describing his past convictions, asking a prosecutor questions during cross-examination, and refusing to answer the prosecutor's question about the identity of the driver. But Mr. Truesdale's combative demeanor on the witness

---

[4] The passage of six intervening years between the trial and the Section 23-110 hearing may well have led to some inconsistencies in Mr. Rudasill's testimony, as well as Mr. Rudasill's brain injury and other health issues *subsequent* to Mr. Truesdale's trial, his retirement from practice, and the criminal cases that he oversaw in the intervening years.

stand cannot reasonably be attributed to Mr. Rudasill.  Even if one were to assume that Mr. Rudasill's preparation bore on Mr. Truesdale's comportment during cross-examination, the record indicates that Mr. Truesdale had strong views about how he wanted his case presented and was not always persuaded to follow Mr. Rudasill's recommendations.  Further, any potential effect of Mr. Truesdale's conduct on the outcome of the trial is minimized by the strength of the testimony of Mr. Hilton, Mr. Cook, and Mr. Colbert and the other corroborating evidence.

The record supports the trial court's finding that it was likely that Mr. Truesdale desired to testify all along and that despite preparing his client to testify, Mr. Rudasill could not anticipate or control Mr. Truesdale's combative demeanor on the witness stand.  As the trial judge noted, Mr. Truesdale was being "Mr. Truesdale."  The testimonial evidence of the government's three witnesses was strong and was a testament to the strength of the government's case.  There was no reasonable probability that but for counsel's errors, the result of the trial would have been different.[5]  Accordingly, I would hold that Mr. Rudasill's efforts to prepare

---

[5] *Cf. Dugger*, 295 A.3d at 1119-20 (concluding that, in a case where the government had "a fairly strong case . . . [but] no slam dunk," the trial counsel's deficient performance "tilted the balance in the government's favor," resulting in prejudice).  In *Dugger*, the court held that the "cornerstone of [the government's] case" was the testimony of the victim, such that the absence of that testimony "would

Mr. Truesdale to testify were not prejudicial in light of the strength of the government's case.

## B. Direct Examination Questioning

The majority holds that Mr. Rudasill's performance on direct examination was deficient because Mr. Rudasill asked broad questions that led Mr. Truesdale to inaccurately describe his prior convictions; asked Mr. Truesdale how much money he made as a drug dealer; improperly referenced a pending case against Mr. Truesdale; and failed to seek a limiting instruction on Mr. Truesdale's prior-conviction, incarceration, and pending case testimony.

---

translate into a reasonable probability that [the jury] would not have convicted Dugger." *Id.* And, as the court pointed out, "[t]here were reasons to doubt [the victim's] testimony," irrespective of any impeachment evidence. *Id.* The *Dugger* court concluded that, given these foundational issues with the victim's testimony, had his previous convictions for violent assault and a drug offense been offered to the jury and had the implication that there was evidence that he had a peaceful character been removed, the victim's "version of events becomes significantly more suspect." *Id.* at 1119. In contrast, here the government's case was much stronger than its case in *Dugger* because the government's case did not fundamentally hang on the testimony of a single witness in a make-or-break capacity. Rather, the government's case was based on the testimony of three witnesses: two of whom were corroborated in key, critically important ways by an independent third witness and by physical evidence. Unlike in *Dugger*, where Mr. Dugger's trial counsel failed to impeach the government's chief witness and failed to object to the jury's consideration of non-existent evidence of that witness's peaceful character, here, there is no evidence that Mr. Rudasill failed to utilize favorable impeachment evidence concerning the testimony of Mr. Hilton, Mr. Cook, or Mr. Colbert.

I am not persuaded that Mr. Truesdale's responses to Mr. Rudasill's direct examination damaged his case to an extent sufficient to undermine confidence in the outcome of the trial. Mr. Truesdale's combative conduct during cross-examination and unanticipated testimony on direct were beyond Mr. Rudasill's control. The majority references both specific questions that Mr. Rudasill asked Mr. Truesdale concerning his drug-dealing and phrases used by Mr. Rudasill in his opening argument "foreshadow[ing] that testimony." Starting with the latter, Mr. Rudasill's brief characterization of his client in his opening statement was no indication that the "big-time drug dealer" narrative was planned. The questions asked of Mr. Truesdale during direct examination—the types of drugs he sold, how much money he was making at the time, and how much money he had intended to make on that day if the originally planned drug purchase in Baltimore had been successful—fit within the overall defense strategy of demonstrating that Mr. Truesdale had a longstanding practice of making money from the sale of drugs and not from the robbery of his fellow drug dealers.

Mr. Rudasill's mention of a pending case against Mr. Truesdale that also involved Mr. Hilton's brother was confined to a brief reference before the trial court stopped him from going further. The government then re-crossed Mr. Truesdale on the pending case, asking only if the case Mr. Rudasill mentioned was still pending,

which Mr. Truesdale confirmed. However, the government made little use of this passing reference against Mr. Truesdale. Accordingly, Mr. Truesdale has not established that this fleeting reference was prejudicial to him.

After the prior-conviction testimony was elicited from Mr. Truesdale during his testimony, Mr. Rudasill did not request that the trial court provide a limiting instruction to the jury. However, before the jury deliberations began, the trial court provided a *Goodall* instruction directing the jury not to consider the stipulation of Mr. Truesdale's prior felony charge as anything other than an element of the felon in possession of a firearm (FIP) charge. *See Goodall v. United States*, 686 A.2d 178, 183 (D.C. 1996) (providing a cautionary jury instruction informing the jury that it should not consider a defendant's past felony convictions for any purpose other than its relevance to a specific count in the indictment represented the trial court's assurance that the defendant would still receive a fair trial.); *see also Williams v. United States*, 75 A.3d 217, 221 (D.C. 2013). The trial judge's *Goodall* instruction served to minimize the effect of this testimony, and any prejudice caused by Mr. Rudasill's failure to seek limiting instructions on the jury's determination of Mr. Truesdale's credibility was outweighed by the strength government's case.

\*\*\*

The majority reaches its conclusion largely by inserting its own credibility determinations in the place of those made by the jury and the trial judge. Despite both the judge and the jury sitting for a two-week-long trial, and the trial judge presiding over a two-day-long Section 23-110 hearing, the majority insists that it is in a better position to assess the credibility of Mr. Hilton, Mr. Cook, Mr. Colbert, Mr. Rudasill, and Mr. Truesdale based on the pleadings and a cold record, over a decade after the trial. The majority's contention that "[n]either Cook nor Hilton was an ideal government witness" leads it to conclude that there is a reasonable probability that Mr. Truesdale would not have been convicted but for counsel's errors. The majority, however, minimizes or ignores incriminating consistencies in the testimonies of the government's witnesses and other important, corroborating evidence. Any inconsistencies in the testimony or evidence were insufficient to overcome the strength of the evidence or to justify setting aside the findings of the fact-finders who sat in the presence of the witnesses, assessed their demeanor, and heard their testimony in real time. Moreover, any inconsistencies in the testimony were insufficient to undermine the strength of the government's case or to demonstrate that there was a reasonable probability that the outcome of the case would have been different absent counsel's errors. Therefore, I respectfully dissent.